## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL HENRY MONGIELLO, Derivatively on Behalf of GERON CORPORATION, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| JOHN A. SCARLETT, KAREN EASTHAM, ROBERT J. SPIEGEL, DANIEL M. BRADBURY, V. BRYAN LAWLIS, HOYOUNG HUH, SUSAN M. MOLINEAUX, OLIVIA K. BLOOM, STEPHEN N. ROSENFIELD, | ) Case No. ) ) **VERIFIED STOCKHOLDER** ) **DERIVATIVE COMPLAINT** ) ) ) ) |
| Individual Defendants, -and- | ) ) ) |
| GERON CORPORATION, a Delaware corporation, | ) ) ) |
| Nominal Defendant. | ) ) ) |

Plaintiff Michael Henry Mongiello ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## I.  <u>NATURE AND SUMMARY OF THE ACTION</u>

1.  This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Geron Corporation ("Geron" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Geron's reputation, goodwill, and standing in the business community and has exposed Geron to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Geron in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.  This action seeks to remedy wrongdoing committed by Geron's directors and officers from November 3, 2016 through the present (the "Relevant Period").

3.  Geron is a biotechnology company located in Foster City, California, which specializes in developing and commercializing therapeutic products to inhibit telomerase.

4.  During the Relevant Period, the Company was focused on the development of imetelstat, a first-in-class telomerase inhibitor exclusively owned by Geron. Telomerase is an enzyme that enables cancer cells with the capacity for limitless and uncontrolled proliferation. Imetelstat would be used for the treatment of patients with myelofibrosis ("MF") and myelodysplastic syndromes ("MDS").

5.  MF is an uncommon type of bone marrow cancer that disrupts the body's normal production of blood cells. This can lead to severe anemia, severe pain, bruising, bleeding, weakness, and weight loss. MF patients usually only go through treatments that can substantially reduce the above symptoms. MDS are conditions that can occur when the blood-forming cells in the bone marrow become abnormal. This leads to low numbers of one or more types of blood cells. MDS is considered a type of cancer.

6.      In 2013, Geron disclosed the positive results of a pilot study of MF patients taking Imetelstat that showed 39% of patients with enlarged spleens achieved reduction in spleen size of at least 50%, and symptom responses of at least 50% were observed in 77% of patients. Further, 23% of patients experienced a complete or partial remission, and another 18% of patients experienced clinical improvements, for a total of over 40% of patients experiencing some type of improvement.

7.      In November 2014, capitalizing on the promising results from the pilot study, Geron entered into a collaboration and licensing agreement ("CLA") with Janssen Biotech Inc. ("Janssen"), a division of Johnson & Johnson, for the development of imetelstat for all indications in oncology, including MF, which resulted in a $35 million payment to Geron, with the potential for hundreds of millions more if imetelstat proved effective in treating MF.

8.      In 2015, the Individual Defendants and Janssen initiated the IMbark study/trial, a Phase 2 clinical trial designed to test two doses of imetelstat on MF patients. Under the CLA, while Janssen was responsible for conducting the IMbark study, Geron shared expenses with Janssen and monitored the progress of the study and the data collected through the Joint Steering Committee ("JSC"), which consisted of both senior Geron and Janssen executives.

9.      IMbark's co-primary endpoints sought to measure objectively whether imetelstat reduced (1) spleen size; and (2) a composite of various symptoms called the Total Symptom Score ("TSS"). These co-primary endpoints were selected by the Individual Defendants because they were the endpoints used by the pharmaceutical company Incyte Corporation to gain approval for Jakafi (ruxolitinib), which was, at the time,  the only FDA-approved drug for treating MF.

10.      IMbark was not a blinded study; therefore, members of the JSC, through periodic data reviews, had access to objective data that showed whether patients on imetelstat met the

study's co-primary endpoints. IMbark had fourteen secondary endpoints to measure patient responses to imetelstat, including overall survival. Overall survival was not selected as a primary endpoint because IMbark, as a Phase 2 study, did not have a control arm, and as a result, this endpoint was unreliable. Variability in patient selection and baseline patient health conditions could be biased and overstate or understate treatment efficacy.

11.     In October 2016, the last patient enrolled in the IMbark study. The study enrolled about 100 patients in total. Patients in IMbark were followed for 24 weeks after their last treatment, which made objective data determining the proportion of patients that met the two co-primary endpoints available around April 2017.

12.     Nevertheless, the results of the IMbark study showed that imetelstat was not effective in improving quality of life because the vast majority of patients in the IMbark study had failed to meet the trial's co-primary endpoints at week 24. In conclusion, the results of the IMbark study showed imetelstat did not produce the same outcomes seen in studies of Jakafi, or the unprecedented results seen in the earlier pilot study of MF patients taking imetelstat.

13.     The material adverse results doomed Geron's partnership with Janssen because Janssen would decide whether to continue to license imetelstat based, in part, on the results of the two primary endpoints in the IMbark trial. This was even more significant because Janssen's contributions depended on this study's and future studies' results. Following the JSC's review of the IMbark data in 2016 and 2017, instead of disclosing IMbark's material, adverse results, Geron's Chief Executive Officer ("CEO"), Defendant John A. Scarlett ("Scarlett"), falsely stated that Geron observed "encouraging trends in the efficacy data" and "outcomes measures" that included "a range of spleen volume reductions" and "decreases in total symptom scores."

14.     Instead of disclosing that the vast majority of patients in IMbark failed to meet the

two primary endpoints, defendant Scarlett falsely stated that the IMbark data results reviewed in March 2018 "remain consistent with prior data reviews." This was not true, as the IMbark study data did not show "encouraging trends in the efficacy data" because the two primary endpoints, which were the most important clinical outcomes being studied for MF patients, were not met for the vast majority of IMbark study patients. Moreover, none of the patients experienced complete remission.

15.     Based on the data and work performed on IMbark, defendant Scarlett falsely represented that development of imetelstat had been "derisked," misrepresenting that the data from the IMbark study showed imetelstat was effective in reducing spleen size and received an acceptable TSS, caused improved quality of life, and that the IMbark results weighed in favor of Janssen extending its licensing agreement. In truth, the data from the IMbark study showed imetelstat was not effective in reducing spleen size or reducing severe symptoms for the vast majority of patients. These material facts were shrouded by Scarlett's misstatements and omissions.

16.     Finally, during the Relevant Period, the Individual Defendants (defined herein) negligently issued materially false and misleading proxy statements urging stockholders to reelect the Director Defendants Scarlett, Spiegel, Eastham, Lawlis, and Molineaux, under false pretenses.

17.     In March 2019, the truth began to emerge when a biotechnology journalist published an article on STAT News titled "The top-performing biotech stock this year has surged on flimsy data."[1]

18.     On this news, Geron shares, which had closed at $5.98 per share on March 26, 2018, dropped 29% over the next two days to close at $4.23 per share on March 28, 2018.

---

[1] https://www.statnews.com/2018/03/27/geron-stock-price-surge/ (last accessed October 27, 2020)

19.     This, however, did not fully reveal the extent of the fraud with respect to the IMbark study. Indeed, Individual Defendants were undeterred and continued to push the misleading increased survival rate narrative at a March 27, 2018 Healthcare Conference and in the Company's 2018 Q1 and Q2 10-Qs filed on May 10, 2018 and July 31, 2018. At the same time, they continued to hold back the results of the IMbark study and other information which would have allowed investors to evaluate Individual Defendants' positive spin on the study's secondary results.

20.     As a result, the price of Geron common stock continued to trade at artificially inflated levels. Geron took advantage of the inflation that it created by selling more than $83 million of its common stock to unsuspecting investors during the second quarter of 2018.

21.     The truth finally emerged when, on September 27, 2018, Individual Defendants issued a press release admitting that IMbark was a failure. Geron disclosed that patients in the IMbark study had shown only 10% spleen volume reduction and 32% TSS reduction. Not coincidentally, Individual Defendants further announced that Janssen had decided to terminate its partnership with Geron.

22.     In response to these belated disclosures, the price of Geron's stock plummeted from $6.23 per share on September 26, 2018 to $2.31 per share on September 27, 2018, a decrease of over 62%.

23.     Thus, the Company had been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

24.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal

controls over financial reporting.

25.     As detailed herein, and as alleged in the ongoing federal securities class action in the Northern District of California captioned *Tollen v. Geron Corporation, et al.,* Case No. 20-cv-547, (the "Securities Class Action"), Geron's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## II.     JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have such jurisdiction.

28.     This Court has personal jurisdiction over each of the Individual Defendants because each Defendant is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

29.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Geron is incorporated in this District. In addition, the defendants have conducted business in this District, and the defendants' actions have had an effect in this District.

## III.     THE PARTIES

### Plaintiff

30.     Plaintiff Michael Henry Mongiello is and has continuously been a stockholder of Geron during the wrongdoing complained of herein.

**Nominal Defendant**

31.     Nominal Defendant Geron is a Delaware corporation with its principal executive offices at 919 East Hillsdale Boulevard, Suite 250, Foster City, CA 94404. Geron's shares trade on the NASDAQ under the ticker symbol "GERN."

**Individual Defendants**

32.     Defendant John A. Scarlett ("Scarlett") has served as Chairman since December 2018, President since January 2012, and Chief Executive Officer and a director since September 2011.

33.     Defendant Karen Eastham ("Eastham") has served as Lead Independent Director of Geron since December 2018 and a director since March 2009. Eastham currently serves and previously served on the Audit Committee in 2016, 2017, and 2018.

34.     Defendant Robert J. Spiegel ("Spiegel") has served as a director of Geron since May 2010.

35.     Defendant Daniel M. Bradbury ("Bradbury") served as a director of Geron from September 2012 until June 2019. Bradbury served on the Audit Committee during 2016, 2017, and 2018.

36.     Defendant V. Bryan Lawlis ("Lawlis") has served as a director of Geron since March 2012. Lawlis currently serves and served on the Audit Committee during 2016, 2017, and 2018.

37.     Defendant Hoyoung Huh ("Huh") was the Chairman of the Board from September 2011 and director until December 26, 2018, served as interim Executive Chairman from February 2011 to September 2011, and has served as a director of Geron since May 2010.

38.     Defendant Susan M. Molineaux ("Molineaux") has served as a director of Geron since September 2012.

8

39.     Defendant Olivia K. Bloom ("Bloom") has served as Executive Vice President, Finance since February 2014, Chief Financial Officer since December 2012, and Treasurer since February 2011. Bloom served as Senior Vice President, Finance from December 2012 to February 2014, Chief Accounting Officer from September 2010 to December 2012 and Vice President, Finance from January 2007 to December 2012.

40.     Defendant Stephen N. Rosenfield ("Rosenfield") is Executive Vice President, Chief Legal Officer and Corporate Secretary since January 2019. He served as General Counsel since January 2012 and Secretary since October 2011.

41.     Collectively, Defendants Scarlett, Eastham, Spiegel, Bradbury, Lawlis, Huh, and Molineaux, are referred to herein as the "Director Defendants."

42.     Collectively, Defendants Scarlett, Eastham, Spiegel, Bradbury, Lawlis, Huh, Molineaux, Bloom, and Rosenfield are referred to herein as the "Individual Defendants".

43.     Collectively, Defendants Bradbury, Eastham, and Lawlis, are referred to herein as the "Audit Committee Defendants."

44.     The Individual Defendants, because of their positions with Geron, possessed the power and authority to control the contents of Geron's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or

misleading.

**Non-Party Directors**

45.     Dawn C. Bir ("Bir") has served as a director of the Company since March 2019.

46.     Elizabeth G. O'Farrell ("O'Farrell") has served as a director of the Company since March 2019. She is currently a member of the Audit Committee.

## IV.    SUBSTANTIVE ALLEGATIONS

**Background**

47.     Geron is a biotechnology company located in Foster City, California that specializes in developing and commercializing therapeutic products for cancer treatment that inhibit telomerase.

48.     According to the Company's website, during the Relevant Period, Geron was only working on imetelstat, and thus was and is entirely dependent on the success of imetelstat. To be successful, imetelstat needed FDA approval. FDA approval for a new drug is generally a twelve to fifteen-year process with multiple stages, which are described below.

49.     In 2014, imetelstat was in early-phase clinical development for treatment of patients with MF and MDS. MF is an uncommon type of bone marrow cancer that disrupts the body's normal production of blood cells. MF causes extensive scarring in bone marrow, leading to severe anemia that can cause weakness and fatigue. It can also increase the risk of bleeding. MF often causes an enlarged spleen.

50.     Geron claimed that results of an early clinical "Pilot Study" indicated that imetelstat had a disease-modifying activity in MF, produced "unprecedented and durable" remissions, and provided evidence that imetelstat's mechanism of action inhibited growth of cancer cells. Geron reported that in the pilot study, 39% of patients with enlarged spleens achieved reduction in spleen size of at least 50%, and symptom responses of at least 50% were observed in 77% of patients.

The Company also reported that over 23% of patients experienced a complete or partial remission, while another 18% experienced clinical improvements, for a total of over 40% of patients experiencing some type of significant improvement. Defendant Scarlett described these results as "unprecedented" and "durable."

### The Joint Development of Imetelstat

51.      On November 13, 2014, Geron and Janssen entered into a CLA, which granted Janssen the exclusive rights to develop and commercialize Imetelstat worldwide for all indications in oncology, including MF. In return, Geron received a $35 million upfront payment from Janssen and was entitled to millions more, up to $900 million, for achieving certain milestones and royalties from the sale of imetelstat. This collaboration was heavily loaded on the back-end because approximately 95% of Janssen's total contribution would only occur if milestones like the IMbark study achieved promising results, making phases of testing much more important.

52.      Geron and Janssen planned to develop Imetelstat under a joint plan, which was expected to include Phase 2 studies in MF and MDS as initial studies, additional registration studies in MF and MDS, and exploratory Phase 2 studies for treatment of related diseases. The joint plan aimed to begin the Phase 2 study in MF in mid-2015, followed by a Phase 2/3 MDS study. Under the CLA, Geron and Janssen were to split the development cost equally. Nevertheless, the CLA allowed Janssen to withdraw from jointly developing imetelstat with Geron if certain milestones were not met.

53.      Geron and its senior management, including Defendant Scarlett, were well aware of the joint development process of imetelstat. For example, Geron's Executive Vice President of Development and Technical Operations and Executive Vice President of Business Development and Portfolio & Alliance Management, who reported directly to Defendant Scarlett, were members

of the JSC. Together with Janssen's senior executives, the JSC oversaw and monitored the IMbark study, and reviewed the results and progress, including periodic reviews of IMbark study data, clinical, regulatory and safety data, results, reports, and analyses.

54.     As stated by Defendant Scarlett on an earnings call held with investors and analysts on November 14, 2014, the Company would play "an active role on the joint steering committee and other governance committees" and would participate "fully in the governance of the joint development and commercial efforts of the partnership over the life of the agreement." Defendant Scarlett also stated during a March 3, 2015 earnings call with investors and analysts that:

> [W]e plan to continue to diligently represent Geron's interest on the imetelstat joint development committee and joint steering committee, as well as on several joint working groups operating under the purview of the joint steering committee. Through these committees, our responsibilities include active review and approval of all clinical studies; manufacturing plans and budgets; and leading the filing, prosecution and maintenance of the imetelstat global patent portfolio.
>
> For example, work with Janssen is ongoing on the protocol for the new Phase II MF Trial.

55.     Two years later, during a May 9, 2017 shareholder/analyst call held with investors and analysts, defendant Scarlett further explained Geron's role in the joint development process of Imetelstat, stating:

> [T]he Joint Steering Committee which consists of senior Janssen executives and senior Geron executives.…So look at all the data and say yes, we agree. They usually are looking at the work of other subcommittees. They have multiple subcommittees that, if you will, report up to the Joint Steering Committee.

**The IMbark Phase 2 Study**

56.     On April 24, 2015, Janssen and Geron initiated the IMbark study for imetelstat, a Phase 2 "Study to Evaluate Activity of 2 Dose Levels of Imetelstat in Participants With Intermediate-2 or High-Risk Myelofibrosis (MF) Previously Treated With Janus Kinase (JAK)

Inhibitor". The IMbark study was designed to evaluate the activity of imetelstat in patients with high-risk MF who did not respond to other treatment (refractory) and to evaluate the findings in the earlier pilot study. In July 2015, IMbark started enrolling patients.

57.     IMbark's co-primary efficacy endpoints measured whether imetelstat reduced spleen volume and alleviated other debilitating symptoms. Spleen volume reduction is defined as the proportion of patients who achieve at least 35% reduction in spleen volume from baseline at the week 24 visit, which could be objectively measured by imaging scan. Total symptom reduction is defined as the proportion of patients who have at least 50% reduction in TSS from baseline at the week 24 visit, based on patient-reported severity of their symptoms associated with MF.

58.     Spleen volume reduction and reduction in symptoms were chosen as primary endpoints to measure the efficacy of imetelstat because they were used in connection with FDA approval of the Jakafi therapy, which was the only FDA-approved drug for adults with certain types of MF at the time. In the Phase 3 study data for Jakafi, 42% of patients achieved a reduction greater than 35% in spleen volume (compared to 1% of patients in a control group taking a placebo), and achieved high levels of reduction in severe and debilitating symptoms. As described by Defendant Scarlett during an April 10, 2017 conference call with investors and analysts, Geron and Janssen "chose these endpoints because the only precedent for regulatory approval in MF was developed from previous trials in which ruxolitinib [(Jakafi)], a JAK inhibitor, was used to treat front-line MF patients."

59.     IMbark's fifth secondary endpoint was overall survival. Overall survival was not selected as a primary endpoint because IMbark, as a Phase 2 study, did not have a control arm and overall survival may be unreliable. Variability in patient selection and baseline patient conditions may overstate or understate treatment efficacy.

60.     On September 12, 2016, during a conference call with analysts and investors, Defendant Scarlett provided an update on IMbark based on an interim review of IMbark data. While Defendant Scarlett declined to discuss specific data results, he described the data results as showing "encouraging trends in the efficacy data" that "were observed." In response to an analyst question for details about the encouraging trends, defendant Scarlett responded:

> We're not talking about the specifics of any of these results in terms of, you know, various outcomes and so forth. We've always stated that we wouldn't be doing that. We'd just be talking about outcomes of the trial. So, I don't think I'm in a position to really make much more of a comment about that other than to say that, obviously, they're -- they were encouraging trends in progressing towards the assessment of the co-primary endpoints, the spleen and symptoms reduction. But beyond that, I don't think I would -- I'm in a position to talk about specifics.

61.     Because spleen volume reduction and TSS were measured after patients had been taking the drug for 24 weeks, and the last patient enrolled in IMbark in October of 2016, the objective data regarding the co-primary endpoints for all patients enrolled in IMbark, which showed that 90% of patients failed to experience a spleen volume reduction of at least 35%, 68% failed to experience an improvement in severe, debilitating symptoms of at least 50%, and that none of the patients experienced a complete remission, were available starting in or around April 2017.

62.     On April 10, 2017, during a conference call with analysts and investors, Defendant Scarlett discussed a second JSC internal review of IMbark data. Defendant Scarlett stated that the JSC reported that "spleen volume response rate observed to date was less than that reported in frontline MF patients treated in trials with other drugs" but did not disclose any IMbark data or the material, adverse data results. Defendant Scarlett, instead, falsely stated that "activity within multiple outcome measures was observed with imetelstat treatment, which suggests clinical benefit in this relapsed or refractory MF population. These outcome measures included a range of spleen

volume reductions, decreases in total symptom scores and improvements in hematologic parameters such as anemia and peripheral blood counts."

63.     In March 2018, the JSC conducted a third review of the IMbark data based on the data as of January 2018, over 64 weeks after the last patient enrolled in IMbark. All of the patients in the IMbark study had taken imetelstat so the results were not "blinded," meaning that the JSC members could see overall spleen volume reduction and total symptom scores for patients who participated in IMbark. The March 2018 review was reported to Defendant Scarlett.

64.     The IMbark trial results indicated that imetelstat was not effective in treating MF and that it did not have a disease modifying effect. 90% of patients failed to experience a spleen volume reduction of at least 35%, and 68% had failed to experience a reduction in debilitating symptoms of at least 50%. Furthermore, only one patient experienced a partial response and there were not any complete responses, for an overall response rate of just 1.7%, demonstrating that imetelstat did not have a disease modifying effect. The earlier pilot study's results were not repeated.

65.     By April 2018, Janssen began conducting its primary analysis of the IMbark data. The timing of Janssen's decision whether to continue licensing imetelstat was determined by the completion of the primary analysis of IMbark, which Geron expected by September 30, 2018.

**The Individual Defendants' False and Misleading Statements**

66.     During the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors materially adverse information about the IMbark study. Individual Defendants intentionally touted positive information and omitted material negative information from investors. Imetelstat was the only drug that Geron was developing and the failure of the IMbark

study left the Company dead in the water. The Individual Defendants saw one option, which was to forestall the coming storm by distracting investors with de minimis positive information, which extended the inflated stock price while inducing investors.

67.     On November 3, 2016, the Individual Defendants caused the Company to issue a press release announcing the Company's financial results for the quarter ended September 30, 2016 ("3Q16 Press Release"). The 3Q16 Press Release stated the following:

> In the third quarter of 2016, Janssen conducted planned internal reviews of initial data from IMbarkTM and IMergeTM,[2] the ongoing clinical trials of Imetelstat.
>
> - IMbarkTM was designed to evaluate two dose levels of Imetelstat (either 4.7 mg/kg or 9.4 mg/kg administered every three weeks) in approximately 200 patients (approximately 100 patients per dosing arm) with Intermediate-2 or High risk myelofibrosis (MF) who have relapsed after or are refractory to prior treatment with a JAK inhibitor. The co-primary efficacy endpoints for the trial are spleen response rate and symptom response rate at 24 weeks.
>
>   Janssen's review included data from 20 patients from each dosing arm who had been followed on the trial for at least 12 weeks. In this review, no new safety signals were identified and the safety profile was consistent with previous Imetelstat clinical trials in hematologic myeloid malignancies. Activity in the 4.7 mg/kg dosing arm did not warrant further investigation of that dose, and this arm has been closed to new patient enrollment. In the 9.4 mg/kg dosing arm, even though at the week 12 data assessment an insufficient number of patients met the protocol defined interim criteria, this arm warranted further investigation because encouraging trends in the efficacy data were observed. New enrollment in the 9.4 mg/kg arm has been suspended while the trial continues in order to obtain additional and more mature data that includes a longer follow-up of these patients at 24 weeks.
>
>   Enrolled patients in both arms are permitted to continue to receive Imetelstat. Janssen has submitted a protocol amendment to health authorities that includes allowing eligible patients in the 4.7 mg/kg dosing arm to increase their dose to 9.4 mg/kg per investigator discretion.

---

[2] IMerge is a two-part clinical trial of Imetelstat in transfusion dependent patients with Low or Intermediate-1 risk Myelodysplastic Syndrome, who have relapsed after or are refractory to prior treatment with an Erythropoiesis-Stimulating Agent. Plaintiff does not allege that the Individual Defendants made any materially false or misleading statements regarding IMerge in this action.

- Second internal data reviews of additional and more mature data from both trials are planned by the end of the second quarter of 2017

68.     On November 3, 2016, the Individual Defendants caused the Company to file a Form 10-Q with the SEC for the quarter ended September 30, 2016 ("3Q2016 10-Q").

69.     The 3Q2016 10-Q contained similar comments highlighting the Company's CLA with Janssen, the IMbark trial, and the primary endpoints of spleen response rate and total symptom score at 24 weeks. The 3Q2016 10-Q and its certification were signed by Bloom. The 3Q2016 10-Q stated the following:

> IMbark™ was designed to evaluate two dose levels of imetelstat (either 4.7 mg/kg or 9.4 mg/kg administered every three weeks) in approximately 200 patients (approximately 100 patients per dosing arm) with Intermediate-2 or High Risk MF who have relapsed after or are refractory to prior treatment with a janus kinase, or JAK, inhibitor. The co-primary efficacy endpoints for the trial are spleen response rate and symptom response rate at 24 weeks.

> To inform an assessment of the appropriate dose and schedule of imetelstat for relapsed or refractory MF patients in IMbark™, in the third quarter of 2016, Janssen conducted a planned internal interim review of safety, efficacy and pharmacokinetic data from 20 patients from each dosing arm who had been followed on the trial for at least 12 weeks. Based on this first internal review at the 12-week time point, the following was determined by Janssen:

> - The safety profile was consistent with previous imetelstat clinical trials in hematologic myeloid malignancies. No new safety signals were identified.
> - Activity in the 4.7 mg/kg dosing arm did not warrant further investigation of that dose, and this arm has been closed to new patient enrollment.
> - In the 9.4 mg/kg dosing arm, even though at the week 12 data assessment an insufficient number of patients met the protocol defined interim criteria, this arm warranted further investigation because **encouraging trends in the efficacy data were observed.** New enrollment in the 9.4 mg/kg arm has been suspended while the trial continues in order to obtain additional and more mature data that includes a longer follow-up of these patients at 24 weeks.

(Emphasis added)

70.     With the release of the 3Q 2016 10-Q, Individual Defendants began touting the "encouraging" results and omitting the actual negative trends. This exclusion of material

information induced investors and inflated the stock price.

71.     On March 1, 2017, the Individual Defendants caused the Company to file a Form 10-K with the SEC for 2016 ("2016 10-K"), which was signed by all of the Director Defendants and Bloom. The certification was signed by Scarlett and Bloom. The 2016 10-K contained similar comments highlighting the Company's CLA with Janssen, the IMbark trial, and the primary endpoints of spleen response rate and total symptom score at 24 weeks. The 2016 10-K did not disclose all of the IMbark study's secondary endpoints, focusing only on: (i) complete remission or partial remission rate; (ii) clinical improvement rate; (iii) anemia; (iv) spleen and symptom responses; and (v) safety.

72.     The 2016 10-K stated the following:

*Imetelstat Clinical Trials Initiated Under the Collaboration with Janssen*

***

IMbark was initiated to assess the efficacy, safety and tolerability of two dose levels of single-agent Imetelstat in patients with MF. The trial was originally designed to enroll approximately 200 patients, including approximately 100 patients per dosing arm, with DIPSS intermediate-2 or high risk MF who have relapsed after or are refractory to JAK inhibitor treatment. At the time of enrollment, patients must have measurable splenomegaly and symptoms of MF. Patients were assigned randomly on a blinded basis in a 1:1 ratio to one of two dosing arms—9.4 mg/kg every three weeks or 4.7 mg/kg every three weeks. Dose reductions for adverse events are allowed and follow protocol-specified algorithms.

The co-primary efficacy endpoints for the trial are spleen response rate and symptom response rate. Spleen response rate is defined as the percentage of patients who achieve ³35% reduction in spleen volume from baseline at the Week 24 visit, as measured by imaging scans and assessed at a central imaging facility and by an Independent Review Committee. Symptom response rate is defined as the percentage of patients who have ³50% reduction in Total Symptom Scores from baseline at the Week 24 visit, based on patient-reported outcomes on a modified Myelofibrosis Symptom Assessment Form version 2.0 electronic diary. Secondary efficacy endpoints include the number of patients achieving complete remission, or CR, or partial remission, or PR, clinical improvement, or CI, and anemia, spleen and symptom responses as assessed using the modified 2013 International Working Group for Myeloproliferative Neoplasms Research and Treatment, or IWG-MRT

criteria, described in a 2013 Blood article. These secondary endpoints will be assessed at the time of the primary efficacy analysis. Exploratory endpoints include cytogenetic and molecular responses, as well as leukemia-free survival.

\*\*\*

Outcomes of First Internal Data Review of IMbark

- The 9.4 mg/kg dosing arm warranted further investigation because **encouraging trends in the efficacy data were observed**. However, new patient enrollment to this arm was suspended because an insufficient number of patients met the protocol defined interim efficacy criteria at 12 weeks to confirm dosing.

Current Status of IMbark

\*\*\*

**We expect Janssen to conduct a second internal data review** to assess potential future development, if any, of Imetelstat in MF, as well as to assess whether 9.4 mg/kg is the appropriate starting dose and is sufficiently efficacious and safe for the IMbark patient population. In the first quarter of 2017, Janssen initiated the process for the second internal data review for IMbark, which will include comprehensive analyses encompassing safety, efficacy, pharmacokinetic and pharmacodynamic data, as well as other exploratory assessments, such as cytogenetic and molecular data, from patients enrolled in the 9.4 mg/kg dosing arm who have been followed for at least 24 weeks, consistent with the co-primary efficacy endpoints. Following the second internal review, we expect Janssen could decide to resume enrollment in the 9.4 mg/kg dosing arm, modify the trial, close the trial, discontinue development of Imetelstat in MF, or terminate the Collaboration Agreement. We expect the outcomes from the second internal data reviews for both IMbark and IMerge, regulatory considerations and the totality of other program information, including the evolving treatment landscapes in MF and MDS, to inform Janssen's decisions regarding future development plans for Imetelstat. We expect Janssen's decision-making regarding IMbark, the Imetelstat program and the Collaboration Agreement to occur in the second quarter of 2017. Janssen's decisions regarding future development plans for Imetelstat, if any, may be subject to subsequent regulatory feedback.

The protocol-specified primary analysis of the co-primary efficacy endpoints in IMbark is planned to occur after all patients (i.e., planned to be approximately 100 enrolled and treated patients on the 9.4 mg/kg dosing arm) have been followed for at least 24 weeks. Due to the current suspension of new patient enrollment in IMbark, the timing of the protocol-specified primary analysis for the trial is uncertain and may be substantially delayed due to numerous factors, including whether Janssen resumes patient enrollment in the trial, or may not occur at all if

IMbark is terminated early based on preliminary data, safety concerns or for any other reason.

***

<strong>RISKS RELATED TO OUR BUSINESS</strong>

We have exclusively outlicensed Imetelstat, which was our sole product candidate, to Janssen. **We are wholly dependent upon our collaborative relationship** with Janssen to further develop, manufacture and commercialize Imetelstat. If Janssen fails to perform as required by the Collaboration Agreement or abandons the Imetelstat program, the potential for us to generate future revenues from milestone payments and royalties from Imetelstat would be significantly reduced, the development and/or commercialization of Imetelstat could be terminated or substantially delayed, and our business would be severely harmed.

(Emphasis added)

73.     The 2016 10-K admits that the entire Company is dependent on Janssen's collaboration which is dependent on the IMbark study. The filing admits this crucial piece of information while also explaining a second internal data review will occur without giving details regarding the first interval data review. This filing told the investor that the first interval data review shows "encouraging trends in the efficacy data." Therefore, this is a continued approach by the Individual Defendants to shroud the actual results while inflating the stock price and inducing investors.

74.     On May 9, 2017, the Individual Defendants caused the Company to issue a press release announcing the Company's financial results for the quarter ended March 31, 2017 ("1Q2017 Press Release").  In the section titled "Recent Company Events," the 1Q2017 Press Release stated:

In April 2017, the second internal data reviews of IMerge and IMbark were completed. Based on these reviews, the Joint Steering Committee determined the following:

- Both trials continue unmodified, and patients remaining in the treatment phases may continue to receive imetelstat.

20

- The safety profile of imetelstat in both trials was consistent with prior clinical trials of imetelstat in hematologic malignancies, and no new safety signals were identified.

- **For IMerge, the benefit/risk profile of imetelstat in the Phase 2 patients supports continued development in lower risk MDS.** A data package and proposed design refinements to the Phase 3 component of the trial are planned to be provided to the FDA. In addition, the Phase 2 data from IMerge are expected to be submitted for consideration for presentation at a medical conference in the future.

- **For IMbark, the current results suggest clinical benefit and a potential overall survival benefit associated with Imetelstat treatment in relapsed or refractory MF.** Enrollment of new patients to the trial remains suspended because the total number of patients enrolled to date is adequate to assess longer-term outcome measures, including overall survival, when the data are fully matured.

Geron expects further decisions by Janssen on the development of Imetelstat will be informed by maturing efficacy and safety data from the trials, feedback from health authorities, and the totality of Imetelstat program information, including an assessment of the evolving treatment landscapes in MDS and MF and the potential application of Imetelstat in multiple hematologic malignancies.

75.    The 1Q 2017 Press Release induces investors with a new tactic. It begins to put emphasis on survival rate in patients with MF. This is misleading because survival is not one of the two primary endpoints in the IMbark study, it is one of the secondary endpoints. Therefore, the Individual Defendants are inducing investors by ignoring the primary endpoints and focusing on a secondary endpoint. This also causes an inflation of the stock price because the progress with the primary endpoints is not being revealed.

76.    On May 9, 2017, the Individual Defendants caused the Company to file a Form 10-Q with the SEC for the quarter ended March 31, 2017 ("1Q2017 10-Q"). The 1Q 2017 10-Q was signed by Bloom. Its certification was signed by Bloom and Scarlett.

77.     The 1Q2017 10-Q stated:

In these relapsed or refractory MF patients treated in the 9.4 mg/kg dosing arm**, the spleen volume response rate observed to date was less than that reported in front-line MF patients treated in trials with other drugs. However, activity within multiple outcome measures was observed with imetelstat treatment, which suggests potential clinical benefit in this relapsed or refractory MF patient population.** These outcome measures included a range of spleen volume reductions, reductions in Total Symptoms Score, and improvements in hematologic parameters, such as anemia and peripheral blood counts. In addition, the data suggest there may be a potential overall survival benefit associated with imetelstat treatment in these patients.

***

During the next year, we expect Janssen to evaluate maturing efficacy and safety data from the IMbark trial, including an assessment of overall survival. We expect the longer-term data from the trial, potential regulatory feedback, the totality of Imetelstat program information, including an assessment of the evolving treatment landscape in MF and the potential application of Imetelstat in multiple hematologic malignancies, including MDS, will inform Janssen's decision whether to continue development of Imetelstat in relapsed or refractory MF.

(Emphasis added)

78.     The 1Q2017 10-Q downplayed the failures of the study by saying the responses observed were "less than that reported in front-line MF patients" when the actual responses observed were not even close to the responses in front-line MF patients. Therefore, this material omission extended the inflated stock price and induced investors.

79.     On August 9, 2017, the Individual Defendants caused the Company to file a Form 10-Q with the SEC for the six months and quarter ended June 30, 2017 ("2Q2017 10-Q"). The 2Q2017 10-Q was signed by Bloom. Its certification was signed by Bloom and Scarlett.

80.     The 2Q2017 10-Q stated:

In April 2017, a second internal review of IMbark was completed, which included data from the approximately 100 patients who were enrolled in the trial, with each dosing arm analyzed separately. Based on this second internal data review, the JSC determined the following:

- The safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies, and no new safety signals were identified.

- The data support 9.4 mg/kg as an appropriate starting dose for the relapsed or refractory MF patient population.

- In these relapsed or refractory MF patients treated in the 9.4 mg/kg dosing arm, **the spleen volume response rate observed to date was less than that reported in front-line MF patients** treated in trials with other drugs. However, activity within multiple outcome measures was observed with imetelstat treatment, which suggests potential clinical benefit in this relapsed or refractory MF patient population. These outcome measures included a range of spleen volume reductions, reductions in Total Symptoms Score, and improvements in hematologic parameters, such as anemia and peripheral blood counts. In addition, the data suggest there may be a potential survival benefit associated with imetelstat treatment in these patients.

The trial continues without any modifications, and patients remaining in the treatment phase may continue to receive imetelstat. Enrollment of new patients to the trial remains suspended because the total number of patients enrolled to date is adequate to perform the protocol-specified primary analysis. All safety and efficacy assessments will be conducted as planned in the protocol, which includes an assessment of a potential survival benefit associated with imetelstat treatment. To date, **median overall survival has not yet been reached in either dosing arm**. We also expect Janssen to perform an internal data review in the first quarter of 2018 to enable a potential protocol amendment to allow the long-term treatment and follow-up of patients, including for survival, beyond the current April 2018 per-protocol end-of-study date.

(Emphasis added)

81.     The 2Q2017 10-Q continued to downplay the failures of the study by saying the responses observed were "less than that reported in front-line MF patients" when the actual responses observed were not even close to the responses in front-line MF patients. Therefore, this material omission extended the inflated stock price and induced investors.

82.     On November 1, 2017, the Individual Defendants caused the Company to file a Form 10-Q with the SEC for the nine months and quarter ended September 30, 2017 ("3Q2017 10- Q"). The 3Q 2017 10-Q was signed by Bloom. Its certification was signed by Bloom and Scarlett.

83.   The 3Q2017 10-Q stated:

In July 2017, the JSC agreed that the timing of the protocol-specified primary analysis for IMbark will begin upon the earlier of either a pre-specified number of deaths occurring in the trial or the end of the third quarter of 2018. Following completion of this primary analysis, which would include an assessment of potential survival benefit associated with imetelstat treatment, we expect Janssen to notify us of its Continuation Decision. We believe that without an adequate survival benefit in relapsed or refractory MF, Janssen would decide to discontinue the Imetelstat program and terminate the Collaboration Agreement, irrespective of any other data from IMbark or from Part 1 of IMerge. Further, the primary analysis may not occur at all if IMbark is terminated early based on preliminary or ongoing data assessments, safety concerns or for any other reason, or placed on clinical hold or suspended by a regulatory authority for an extended period of time, under which circumstances Janssen must instead notify us of its Continuation Decision by the date that is approximately 24 months after the initiation of IMerge.

Separately, a data package, including information addressing the benefit-risk profile of Imetelstat in relapsed or refractory MF, was submitted by Janssen in October 2017 in response to an information request received from the FDA for additional efficacy and safety data, including deaths, justifying continued treatment of patients enrolled in IMbark, and related interactions between Janssen and the FDA are ongoing.

***

In addition to an assessment of potential survival benefit in relapsed or refractory MF, we expect continuing data from IMbark, including the internal data review expected in the first quarter of 2018, the protocol-specified primary analysis for IMbark, ongoing regulatory feedback, the totality of Imetelstat program information, including an assessment of the evolving treatment landscape in MF and the potential application of Imetelstat in multiple hematologic malignancies, including MDS, will inform Janssen's decision whether to continue development of Imetelstat. Further delay in the timing of the Continuation Decision, or a negative Continuation Decision, which would result in termination of the Collaboration Agreement by Janssen, could increase our development costs and impair our ability to earn revenues from milestone payments or royalties under the Collaboration Agreement, any of which would severely and adversely affect our business and business prospects and the future of imetelstat.

84.   The 3Q 2017 10-Q continued to be vague about the IMbark study which extended

the inflated stock price and induced investors.

85.   On March 16, 2018, the Individual Defendants caused Geron to issue a press release

announcing the Company's financial results for 2017. The JSC conducted a data review of the IMbark study in March 2018 (prior to March 16, 2018). The press release discussed the IMbark study and stated the following:

> Janssen completed a third internal data review of IMbark in March 2018, based on a January 2018 data cut, to enable a protocol amendment to allow the long-term treatment and follow up of patients, ***including for survival***, and the Collaboration's Joint Steering Committee (JSC) made the following observations and implemented the following actions:
>
> - The safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies, and no new safety signals were identified.
>
> - Outcome measures for efficacy, including spleen volume responses and reductions in Total Symptom Score remain consistent with the prior data reviews.
>
> - ***With a median follow up of approximately 19 months, the median overall survival has not been reached in either dosing arm.***
>
> - The trial is officially being closed to new patient enrollment. More than 100 patients have been enrolled in IMbark to date, which is expected to be adequate to assess overall survival. ***Patients who remain in the treatment phase may continue to receive Imetelstat, and until the primary analysis, all safety and efficacy assessments are being conducted as planned in the protocol, including following patients, to the extent possible, until death to enable an assessment of overall survival.***
>
> - Based on the rate of deaths occurring in the trial, the protocol-specified primary analysis, ***which includes an assessment of overall survival***, will begin by the end of the second quarter of 2018.
>
> - Upon the protocol-specified primary analysis, the main trial will be completed. The IMbark protocol is being amended to establish an extension phase of the trial to enable patients remaining in the treatment phase to continue to receive Imetelstat treatment per investigator discretion. During the extension phase, standard data collection will primarily consist of safety information.

86.     The above press release focused on overall survival after Janssen had completed a third internal data review and had still not disclosed any material adverse information regarding the primary endpoints. This prolonged the inflated stock price and continued to induce investors.

87.     On March 16, 2018, the Individual Defendants caused the Company to file a Form 10-K with the SEC for 2017 ("2017 10-K"), which was signed by all of the Director Defendants and Bloom. The certification was signed by Scarlett and Bloom. The 2017 10-K stated:

Current Status of IMbark

In March 2018, Janssen completed a third internal data review of IMbark, based on a January 2018 data cut, to enable a protocol amendment to allow the long-term treatment and follow up of patients, including for survival, and the JSC made the following observations and implemented the following actions:

*\*\**

- **Outcome measures for efficacy, including spleen volume response and reductions in Total Symptom Score remain consistent with prior data reviews.**

- With a median follow up of approximately 19 months, the median overall survival has not been reached in either dosing arm.

*\*\**

### Item 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

For IMbark, Janssen completed internal data reviews in September 2016, April 2017 and March 2018. In these data reviews, activity within multiple outcome measures was observed with Imetelstat treatment that suggest potential clinical benefit in patients with MF who are relapsed after or refractory to prior treatment with a janus kinase, or JAK, inhibitor.

*\*\**

### RISKS RELATED TO OUR COLLABORATION WITH JANSSEN

if Imetelstat fails to meet criteria determined by Janssen to support an affirmative Continuation Decision, or for any other reason, Janssen may discontinue the Imetelstat program and terminate the Collaboration Agreement.

*\*\**

Even if Janssen obtains longer-term efficacy and safety data for IMbark, Janssen or the FDA or any other regulatory authorities may determine that such data do not show an adequate improvement in survival to support further development and potential regulatory approval for Imetelstat in relapsed or refractory MF patients,

which we expect would result in a decision by Janssen to discontinue IMbark and the Imetelstat program and terminate the Collaboration Agreement.

*\*\**

***Clinical development involves a lengthy and expensive process with uncertain outcomes. Current clinical trials of imetelstat being conducted by Janssen, including IMbark, IMerge and the Pilot Study, and potential future clinical trials of imetelstat may fail to demonstrate sufficient safety and efficacy of imetelstat to warrant further development of the drug, which could prevent or further delay regulatory approval and commercialization of imetelstat.***

*\*\**

The potential disease-modifying activity observed through molecular responses in the ET trial and partial or complete remissions observed in the Pilot Study may not be seen in current or future clinical trials of Imetelstat.

(Emphasis added)

88.     The 2017 10-K claimed "spleen volume response and reductions in Total Symptom Score remain consistent with prior data reviews." This statement mislead the public into thinking that testing had potential clinical benefits and the collaboration with Janssen was on track. Therefore, the 2016 10-K continued to inflate the stock price while inducing investors.

89.     During a March 19, 2018 earnings call with investor analysts, defendant Scarlett discussed the IMbark study data and the JSC's observations. Defendant Scarlett also stated:

This morning, I'll start my remarks with a summary of the results from the latest internal data review conducted by Janssen on the IMbark and an update on the projected timing of the protocol-specified primary analysis for IMbark and the subsequent potential continuation decision from Janssen. I'll then conclude with the status of the IMerge trial, including a recap of the data that was recently presented at the American Society for Hematology or ASH Annual Meeting, that was in last December.

As a reminder, IMbark is a Phase II clinical trial designed to test 2 doses of imetelstat, 9.4 milligrams per kilogram or 4.7 milligrams per kilogram, administered every 3 weeks in intermediate-2 or high-risk MF patients who are refractory to or have relapsed after treatment with a JAK inhibitor. The planned March 2018 data review was primarily conducted to enable a protocol amendment that will allow the long-term treatment and follow-up of patients in the trial,

including for survival.

In reviewing the data, which was based on a January 2018 data cut, the collaboration's Joint Steering Committee, or JSC, made the following observations: first, the safety profile was consistent with prior clinical trials of Imetelstat in hematologic malignancies and no new safety signals were identified; second, outcome measures for efficacy, **including spleen volume responses and reductions in Total Symptom Score remain consistent with the prior data reviews**; third, with a median follow-up of approximately 19 months as of the January 2018 data cut, the median overall survival has not been reached in either dosing arm.

Following the state of review, the JSC implemented a number of actions. First, the trial is being officially closed to new patient enrollment. From the first enrolled patient in September of 2015 to last patient enrolled in October of 2016, more than 100 patients have been enrolled in IMbark. This number is expected to be adequate to assess overall survival. Patients who remain on the treatment phase may continue to receive Imetelstat, and until the primary analysis, all safety and efficacy assessments are being conducted as planned in the protocol, including following patients, to the extent possible, until death to enable an assessment of overall survival.

Second, based on the death -- rate of deaths occurring in the trial, the JSC determined that the IMbark protocol-specified primary analysis, which includes an assessment of overall survival, will begin by the end of the second quarter of 2018. Upon the completion of the protocol-specified primary analysis, the main trial will be completed.

(Emphasis added)

90.     Defendant Scarlett's representations that the IMbark data showed a potential improvement in overall survival compared to "real world data" were materially false and misleading because he did not disclose the negative data indicating that Imetelstat did not improve quality of life. The actual results of the IMbark study showed 90% of patients failed to experience a spleen volume reduction of at least 35%, 68% failed to experience an improvement in severe, debilitating symptoms of at least 50%, and that none of the patients experienced a complete remission.

91.     On March 27, 2018, Defendant Scarlett made a presentation at the 17th Annual

Needham Healthcare Conference in New York City where he repeated the above-mentioned misleading statements. At the presentation, he introduced a slide titled "IMbark Internal Data Reviews, Findings to Date." The slide, which was also posted on Geron's website, purported to summarize "Internal data reviews completed by Janssen in September 2016, April 2017 and March 2018." It represented that "Activity within multiple outcome measures observed, suggesting clinical benefit in R/R MF" including a "Range of reductions in spleen volume" and "Decreases in Total Symptoms Score (TSS)." Scarlett's statements were materially false and misleading because Scarlett concealed the material negative results of the IMbark study and misrepresented the IMbark outcomes concerning the two key primary endpoints.

92.     The above statements were materially misleading because they failed to disclose: (a) that the IMbark study failed to meet its primary endpoints, the most important measure of the study; (b) that the overall survival rate in the IMbark study could not be meaningfully compared with other studies because baseline disease characteristics of patients enrolled in the IMbark study were not provided; and (c) that, as a result of the foregoing, Janssen, with most of its contributions loaded on the back-end, was likely to terminate its collaboration with Geron and did.

**The Truth Begins to Emerge**

93.     On March 27, 2018, Adam Feuerstein, a veteran biotech journalist, published an article on STAT News, an online life sciences publication, titled "The top-performing biotech stock this year has surged on flimsy data." In the article, Feuerstein questioned whether the Individual Defendants' statements about survival were intentionally misleading.

94.     The article stated in part:

**Shares of Geron have more than tripled in price since January, with most of the gains coming in the past week after CEO John Scarlett suggested the drug, imetelstat, is helping patients with the bone marrow disorder live longer.**

**That proof doesn't exist.** Still, on his words, the company's market value is now

29

approaching $1 billion — a level that is both remarkable and hard to justify for such a risky drug-development program.

***

On a conference call last week, Scarlett said a review of the clinical trial in March showed median overall survival for all the patients had not yet been reached after a follow-up of 19 months. With the study still open, the final, median overall survival might be longer, he said.

Is a median overall survival of 19 months meaningful for these myelofibrosis patients?

Yes, said Scarlett, even though the company's study lacks a control arm to compare against imetelstat for survival.

Undeterred, Scarlett compared the survival update from Geron's imetelstat study to a separate analysis of "real world" myelofibrosis patient outcomes presented at a medical meeting by Janssen in 2016.

For myelofibrosis patients who discontinued or no longer responded to Jakafi, median overall survival was seven months in the Janssen analysis, said Scarlett. That single data makes imetelstat look better. But the rest of the study undermines his argument.

Of the 430 myelofibrosis patients who received Jakafi as a first-line therapy (the patient group highlighted by Scarlett), only 15 percent went on to receive a second-line treatment with a different drug. The other 85 percent of patients received no further treatment, suggesting they were too frail and close to death, according to the Janssen analysis.

Janssen also looked at myelofibrosis patients who received another treatment after Jakafi. These patients lived a lot longer than seven months.

Sixty-three patients received Jakafi first and then a different second-line treatment. Their median survival was 14 months. Another 49 patients started on Jakafi and then received Jakafi again. Their median survival was 30 months. Blended together, the median survival for these 112 patients was approximately 22 months.

By that comparison — which Scarlett did not mention last week — the 19- month median survival for imetelstat patients doesn't look as promising.

I asked Geron and Janssen to disclose the baseline disease characteristics of the 100 myelofibrosis patients enrolled in their Phase 2 study. That information — easily shared without compromising the conduct of the study — would help investors better interpret the interim imetelstat survival data.

Both companies declined the request.

**I also asked Geron and Janssen to explain why they've delayed by almost one year the disclosure of primary endpoint results from the Phase 2 study that would show, definitively, if myelofibrosis patients respond to treatment with imetelstat.**

**Again, they declined to share those data.**

This is perhaps the most troubling aspect of the companies' behavior. **Myelofibrosis drugs are approved based on their ability to shrink enlarged spleens and reduce overall disease symptoms. These two efficacy measures are the co-primary endpoints of the imetelstat study, not survival, which is listed as the fifth secondary endpoint.**

The last myelofibrosis patient to enroll in the Geron and Janssen study did so in October 2016. The patients are treated with imetelstat for 24 weeks, which means **spleen and symptom responses have been available to the companies since April 2017.**

That's almost one year ago, so why haven't these results been disclosed publicly? "We are focused on survival in this myelofibrosis patient population," Geron spokesperson Anna Krassowska told me.

It's reasonable to assume Geron would be screaming from the biotech mountaintop had imetelstat showed meaningful disease activity in these hard-to-treat myelofibrosis patients. (Something other companies developing competing drugs have done.) Keeping those objective data under wraps — while focusing instead on a fuzzy survival talking point — is a significant red flag against imetelstat.

***

Imetelstat is Geron's only drug asset. If the drug fails or if Janssen decides to give up on the partnership — that go/no go decision will be made in the third quarter — Geron will be left with little more than $100 million in cash.

Yet the surge in Geron's stock price over the past week has pushed the biotech's market value close to $1 billion.

   Shaky

(Emphasis added).

95.  After this story broke, Geron's shares dropped 29% over the next two days closing

at \$4.23 on March 28, 2018 from \$5.98 on March 26, 2018. This partial sunlight on Geron's

material omissions and misstatements was not enough to get most of the investors out of the dark.

96.     Despite questions arising from industry experts, the Individual Defendants

continued to mislead the public. On May 10, 2018, the Individual Defendants caused Geron to file

a Form 10-Q with the SEC ("1Q2018 10-Q"). The 1Q 2018 10-Q was signed by Bloom and its

certification was signed by Scarlett and Bloom.

97.     The 1Q 2018 10-Q stated, in part:

> For IMbark, **Janssen completed internal data reviews in September 2016, April
> 2017 and March 2018**. In these data reviews, the JSC determined that the safety
> profile was consistent with prior clinical trials of imetelstat in hematologic
> malignancies, and no new safety signals were identified. In addition, the JSC
> determined that data from the 4.7 mg/kg dosing arm did not warrant further
> investigation of that starting dose and the 4.7 mg/kg arm was closed to new patient
> enrollment following the September 2016 data review. The JSC also determined
> that data supported 9.4 mg/kg as an appropriate starting dose in the trial. In addition,
> the JSC observed activity within multiple outcome measures with imetelstat
> treatment at the 9.4 mg/kg starting dose, suggesting potential clinical benefit in
> patients with MF who are relapsed after or refractory to prior treatment with a JAK
> inhibitor. However, **the JSC observed that the spleen volume response rate in
> the 9.4 mg/kg dosing arm was less than that reported in clinical trials with
> JAK inhibitors in front-line MF patients**, and that an insufficient number of
> patients met the protocol defined interim efficacy criteria to continue enrollment in
> the 9.4 mg/kg dosing arm. Thus, new patient enrollment in the 9.4 mg/kg dosing
> arm was suspended in October 2016. In March 2018, Janssen officially closed the
> trial to new patient enrollment. The JSC expects that the over 100 patients enrolled
> in IMbark to date **will be adequate to assess overall survival**. Patients who remain
> in the treatment phase of IMbark may continue to receive imetelstat, and until the
> protocol-specified primary analysis, all safety and efficacy assessments are being
> conducted as planned in the protocol, including following patients, to the extent
> possible, until death, to enable an assessment of overall survival. The JSC
> concluded that as of January 2018, median follow up was approximately 19 months,
> and median overall survival had not been reached in either dosing arm.

(Emphasis added)

98.     Even after the Company had been partially exposed by Feuerstein's article, the

Individual Defendants still attempted the "look over here" approach. They continued to put

emphasis on assessing overall survival rates, one of the secondary endpoints, and brushing past the results on primary endpoints, spleen volume and reduction in debilitating symptoms. The Company stated, "spleen volume response rate…was less than that reported in clinical trials…with front line patients." This was a massive understatement, what the JSC observed was not just "less than" what was seen in front-line MF patients, but the results from the IMbark study did not even come close to the results seen in front-line MF patients. The Individual Defendants continued to extend the inflated stock price and induce investors with an almost irrelevant secondary endpoint, the survival rate.

99.    Also, on May 10, 2018, the Individual Defendants caused the Company to issue a press release, which continued to fail to disclose the material negative results of the IMbark study. The press release stated, in relevant part:

> "As we have previously announced, we expect Janssen to make its decision about whether to continue their development of imetelstat by the end of third quarter of 2018," said John A. Scarlett, M.D., Geron's President and Chief Executive Officer. "Regardless of Janssen's future decision, we believe imetelstat warrants further development because of the activity observed in lower risk MDS patients from Part 1 of IMerge as presented at ASH last December, and the evolving overall survival in relapsed or refractory MF patients observed in IMbark."

100.    The Individual Defendants continued to conceal the material negative results of the IMbark study. The 2Q2018 10-Q was signed by Bloom and its certificate was signed by Scarlett and Bloom. For example, on July 31, 2018, the Individual Defendants caused the Company to file a Form 10-Q with the SEC ("2Q2018 10-Q"), which contained similar comments highlighting the primary endpoints for Imetelstat in the IMbark trial and that Geron and Janssen had amended the trial protocol to include an "assessment of overall survival, was initiated by Janssen in the second quarter of 2018 with a clinical cut-off date of April 26, 2018. We expect Janssen to inform us of its decision by the end of the third quarter of 2018." The 2Q2018 10-Q did not discuss imetelstat's

results regarding its primary endpoints in the IMbark trial, nor was there any disclosure of imetelstat's metrics with respect to either primary endpoint. Again, as shown by Feuerstein's article, these endpoints are the deciding factors on whether or not to approve a drug for MF. Therefore, the 2Q2018 10-Q continued to omit material results about the failure of the IMbark trial's primary endpoints and touted one of the secondary endpoints which extended the inflated stock price and further induced investors.

### The Truth Finally Emerges

101.   On September 27, 2018, before the market opened, the Individual Defendants disclosed the material, adverse results of the IMbark study when they caused Geron to issue a press release, which announced the termination of the partnership with Janssen and the following:

**IMbark Protocol-Specified Primary Analysis Highlights**

IMbark was designed as a Phase 2 clinical trial to evaluate two starting dose levels of Imetelstat (either 4.7 mg/kg or 9.4 mg/kg administered by intravenous infusion every three weeks) in approximately 200 patients with Intermediate-2 or High-risk myelofibrosis (MF) who have relapsed after or are refractory to prior treatment with a JAK inhibitor.

The co-primary efficacy endpoints for the trial are spleen response rate, defined as the proportion of patients who achieve a ≥35% reduction in spleen volume assessed by imaging; and symptom response rate, defined as the proportion of patients who achieve a ≥50% reduction in Total Symptom Score, at 24 weeks. Key secondary endpoints are safety and overall survival.

For the 9.4 mg/kg dosing arm (n=59), highlights from the primary analysis included a spleen response rate of 10% and a symptom response rate of 32%. No patients achieved complete remission, and one patient achieved partial remission. The safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies, and no new safety signals were identified. The most common adverse events were cytopenias. At the time of the primary analysis, median overall survival had not been reached after 23 months of median follow-up.

102.   On the same day the full results were finally disclosed, STAT News published a follow-up piece concerning Geron's disclosure. The article stated, "Back in March, Geron CEO John Scarlett ignited a steep run higher in the stock price with a suggestion, uttered on a conference

call, that imetelstat was prolonging survival in patients with the bone marrow disorder myelofibrosis." The STAT News article characterized defendant Scarlett's conduct as a "bait-and-switch tactic." The article further stated, "The Phase 2 study was designed primarily to determine if Imetelstat could shrink spleens and improve myelofibrosis disease symptoms. Geron and Janssen were keeping these data hidden, even though they were readily available. Shifting attention to survival was a smokescreen. On Thursday [September 27, 2018], we learned why. The spleen response rate to imetelstat in the myelofibrosis study was a disappointing 10 percent."

103.    Following the disclosures of the truth, the price of Geron's common stock dropped from a closing price on September 26, 2018 of $6.23 per share, to $2.31 per share, a decrease $3.92 per share or over 62%, on massive trading volume of over 84 million shares. As a direct and proximate result of the Individual Defendants' actions as alleged above, Geron's market capitalization was substantially damaged, losing over $1.1 billion in value as a result of the conduct described herein.

**The False and Misleading Proxies**

104.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, Scarlett, Eastham, Lawlis, Molineaux, Spiegel, Bradbury, Huh, and Rosenfield (the "Proxy Defendants") also caused the Company to issue false and misleading proxy statements during the Relevant Period. The Proxy Defendants drafted, approved, and reviewed two Form DEF14As before they were filed with the SEC on March 24, 2017 (the "2017 Proxy") and March 30, 2018 (the "2018 Proxy"). The Proxy Defendants negligently issued materially misleading statements in the 2017 Proxy and the 2018 Proxy (the "Proxies"), both signed by Rosenfield.

105.    These proxy allegations were based solely on negligence, they were not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants,

and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

106.    The 2017 Proxy sought stockholder votes to, among others, elect defendants Eastham, Lawlis, and Molineaux for a three-year term.

107.    In support of the Proxy Defendants' bid to reelect defendants Eastham, Lawlis, and Molineaux, the 2017 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Geron faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. The 2017 Proxy first stated:

> The Board and our management team work together to manage our risks. It is management's responsibility to identify various risks facing the Company, bring the Board's attention to material risks and implement appropriate risk management policies and procedures to manage risk exposure on a day-to-day basis. The Board has an active role in overseeing our risk management process directly or through its committees.

> The Board has delegated responsibility for the oversight of specific risks to the Board committee as follows:

> - The Audit Committee oversees management of financial risks. In addition to fulfilling its responsibilities for the oversight of our financial reporting processes and annual audit of Geron's financial statements, the Audit Committee also reviews with the independent registered public accounting firm and the Company's management the adequacy and effectiveness of our policies and procedures to assess, monitor and manage fraud risk and our ethical compliance program. The Audit Committee takes the appropriate actions to set the best practices and highest standards for quality financial reporting, sound business risk practices and ethical behavior.

> - The Compensation Committee is responsible for overseeing the management of risks relating to our employment policies and executive compensation plans and arrangements. In connection with structuring the executive compensation program, the Compensation Committee, together with the Board, considers whether the elements of such program, individually or in the aggregate, encourage our Named Executive Officers to take unnecessary risks. For further information, see the sub-section entitled "Risk Assessment of Compensation Policies and Practices".

- The Nominating and Corporate Governance Committee manages Geron's corporate governance practices. In addition, the Nominating and Corporate Governance Committee reviews risks associated with the independence of the Board, potential conflicts of interest and risks relating to management and Board succession planning.

While each committee is responsible for evaluating certain risks and overseeing the management of such risks within its respective oversight area, the entire Board is regularly informed through committee reports about such risks.

108.    Second, the 2017 Proxy stated:

## AUDIT COMMITTEE REPORT

The Audit Committee of Geron Corporation's Board of Directors is comprised of three independent directors as required by the listing standards of NASDAQ. The Audit Committee operates pursuant to a written charter adopted and amended by the Board in December 2016. A copy of the Audit Committee's amended and restated charter is available on our website at www.geron.com.

The members of the Audit Committee are Ms. Eastham (Chairperson), Dr. Lawlis and Mr. Bradbury. The Board has determined that all members of the Audit Committee are financially literate as required by NASDAQ. The Board has also determined that Ms. Eastham and Mr. Bradbury are audit committee financial experts as defined by NASDAQ.

The function of the Audit Committee is to assist the Board in fulfilling its oversight responsibilities regarding:

(i)      the quality and integrity of our financial statements,

(ii)     our compliance with legal and regulatory requirements,

(iii)    the qualifications and independence of the independent registered public accounting firm serving as our auditors and

 (iv)    the performance of the independent registered public accounting firm.

Management is responsible for Geron's internal controls and financial reporting. The independent registered public accounting firm is responsible for performing an independent audit of Geron's financial statements in accordance with generally accepted auditing standards and to issue a report thereon. The Audit Committee's responsibility is to monitor and oversee these processes.

In this context, the Audit Committee hereby reports as follows:

 1)    The Audit Committee has reviewed and discussed the audited financial statements of the Company as of and for the fiscal year ended December 31, 2016 with management and the independent registered public accounting firm serving as the Company's independent auditors.

2)    The Audit Committee has discussed with the independent auditors the matters required to be discussed by Auditing Standard No. 1301 (Communication with Audit Committees) as adopted by the Public Company Accounting Oversight Board, other professional standards, membership provisions of the SEC Practice Session, and other SEC rules, as currently in effect.

3)    The Audit Committee has received the written disclosures and the letter from the independent auditors required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent auditor's communications with the Audit Committee concerning independence, and has discussed with the independent auditors the independent auditor's independence.

4)    The Audit Committee has considered whether the independent auditor's provision of non-audit services to the Company is compatible with maintaining the independent auditor's independence.

Based on the reports and discussions described above, the Audit Committee recommended to the Board that the audited financial statements be included in Geron's Annual Report on Form 10-K for the year ended December 31, 2016, for filing with the SEC.

109.    The 2017 Proxy assured stockholders that the Individual Defendants were involved with Geron's operations, actively monitored the Company's risks and exposures, and acted in an ethical and legal manner. In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose: (a) that the IMbark study failed to meet its primary endpoints, the key drivers for approval of MF related drugs, to measure the success of imetelstat; (b) that the overall survival rate in the IMbark study could not be meaningfully compared with other studies, making it almost irrelevant; and (c) that, as a result of the foregoing, Janssen was reasonably likely to terminate its collaboration with Geron.

110.    As a result of these misleading statements, the Company's stockholders voted via

an uninformed stockholder vote to reelect defendants Eastham, Lawlis, and Molineaux.

111.    The Proxy was false and misleading because, while it assured investors that Geron's Code of Business Conduct and its Audit Committee Charter were followed during the preceding fiscal year, the omissions and non-disclosures during the Relevant Period, as outlined herein, demonstrated that the Individual Defendants did not comply with the stated provisions of those documents when filing public statements regarding the affairs of the Company with the SEC.

112.    The 2018 Proxy sought stockholder votes to, among other things, elect defendants Scarlett and Spiegel for a three-year term.

113.    In support of the Proxy Defendants' bid to reelect defendants Scarlett and Spiegel, the 2018 Proxy assured stockholders that the Board and its committees regularly assessed and managed the risks that Geron faced, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. First, the 2018 Proxy stated:

> The Board and our executive management team work together to manage our risks. It is management's responsibility to identify various risks facing the Company, bring the Board's attention to material risks, and implement appropriate risk management policies and procedures to manage risk exposure on a day-to-day basis. The Board has an active role in overseeing our risk management process directly or through its committees.
>
> The Board has delegated responsibility for the oversight of specific risks to the Board committees as follows:
>
> - The Audit Committee oversees management of financial risks. In addition to fulfilling its responsibilities for the oversight of our financial reporting processes and annual audit of Geron's financial statements, the Audit Committee also reviews with the independent registered public accounting firm and the Company's management the adequacy and effectiveness of our policies and procedures to assess, monitor and manage fraud risk and our ethical compliance program. The Audit Committee takes appropriate actions to set the best practices and highest standards for quality financial reporting, sound business risk practices and ethical behavior.
>
> - The Compensation Committee is responsible for overseeing the management of risks relating to our employment policies and executive

compensation plans and arrangements. In connection with structuring the executive compensation program, the Compensation Committee, together with the Board, considers whether the elements of such program, individually or in the aggregate, encourage our Named Executive Officers to take unnecessary risks. For further information, see the sub-section entitled "Risk Assessment of Compensation Policies and Practices."

- The Nominating and Corporate Governance Committee manages Geron's corporate governance practices. In addition, the Nominating and Corporate Governance Committee reviews risks associated with the independence of the Board, potential conflicts of interest and risks relating to management and Board succession planning.

While each committee is responsible for evaluating certain risks and overseeing the management of such risks within its respective oversight area, the entire Board is regularly informed through committee reports about such risks.

114.    Second, the 2018 Proxy stated:

## AUDIT COMMITTEE REPORT

The Audit Committee of Geron Corporation's Board of Directors is comprised of three independent directors as required by the listing standards of Nasdaq. The Audit Committee operates pursuant to a written charter that was last amended and restated by the Board in November 2017. A copy of the Audit Committee's amended and restated charter is available on our website at www.geron.com.

The members of the Audit Committee are Ms. Eastham (Chairperson), Dr. Lawlis and Mr. Bradbury. The Board has determined that all members of the Audit Committee are financially literate as required by Nasdaq. The Board has also determined that Ms. Eastham and Mr. Bradbury are audit committee financial experts as defined by Nasdaq.

The function of the Audit Committee is to assist the Board in fulfilling its oversight responsibilities regarding:

(i)      the quality and integrity of our financial statements,

(ii)     our compliance with legal and regulatory requirements,

(iii)    the qualifications and independence of the independent registered public accounting firm serving as our auditors and

(iv)     the performance of the independent registered public accounting firm.

Management is responsible for Geron's internal controls and financial reporting. The independent registered public accounting firm is responsible for performing an independent audit of Geron's financial statements in accordance with generally accepted auditing standards and to issue a report thereon. The Audit Committee's responsibility is to monitor and oversee these processes.

In this context, the Audit Committee hereby reports as follows:

1) The Audit Committee has reviewed and discussed the audited financial statements of the Company as of and for the fiscal year ended December 31, 2017 with management and the independent registered public accounting firm serving as the Company's independent auditors.

2) The Audit Committee has discussed with the independent auditors the matters required to be discussed by Auditing Standard No. 1301 (Communication with Audit Committees) as adopted by the Public Company Accounting Oversight Board, other professional standards, membership provisions of the SEC Practice Session, and other SEC rules, as currently in effect.

3) The Audit Committee has received the written disclosures and the letter from the independent auditors required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent auditor's communications with the Audit Committee concerning independence, and has discussed with the independent auditors the independent auditor's independence.

4) The Audit Committee has considered whether the independent auditor's provision of non-audit services to the Company is compatible with maintaining the independent auditor's independence.

Based on the reports and discussions described above, the Audit Committee recommended to the Board that the audited financial statements be included in Geron's Annual Report on Form 10-K for the year ended December 31, 2017, for filing with the SEC.

115.    The 2018 Proxy assured stockholders that the Individual Defendants were involved with Geron's operations, actively monitored the Company's risks and exposures, and acted in an ethical and legal manner. In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose: (a) that the IMbark study failed to meet its primary endpoints, the key drivers for approval of MF related drugs, to measure the success of imetelstat; (b) that the overall survival

rate in the IMbark study could not be meaningfully compared with other studies, making it almost irrelevant; and (c) that, as a result of the foregoing, Janssen was reasonably likely to terminate its collaboration with Geron, which caused Geron to pony up another $7 million in 2018 alone and lose all of Janssen's back-loaded milestone funding.

116.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Scarlett and Spiegel.

117.    The above Proxies were false and misleading because, while they assured investors that Geron's Code of Business Conduct and its Audit Committee Charter were followed during the preceding fiscal year, the omissions and non-disclosures during the Relevant Period, as outlined herein, demonstrated that the Individual Defendants did not comply with the stated provisions of those documents when filing public statements regarding the affairs of the Company with the SEC.

## V.    FIDUCIARY DUTIES

118.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Geron and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Geron in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Geron and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

119.    Each Individual Defendant owes and continues to owe Geron, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

120.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Geron, were able to, and did, directly and/or indirectly, exercise control

over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Geron, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

121.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)    conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c)    remain informed as to how Geron conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

122.    The Individual Defendants, as officers and/or directors of Geron, were bound by the Company's Code of Business Conduct[3] (the "Code of Conduct"). The Company's Chief

---

[3] See Geron Code of Business Conduct:
https://s24.q4cdn.com/668523011/files/Gov_Doc/CodeOfConduct.pdf

Executive Officer, Chief Financial Officer and General Counsel are collectively referred to as the "Disclosure Committee." The Code of conduct required the following:

> Among other things, Geron expects and demands that all employees will:
>
> - Comply with all applicable laws and regulations;
> - Comply with the specific policies set forth in this Code of Conduct and with all other Company policies;
> - Report any suspected violations of law, the Code or Company policy to the appropriate Company officer; and
> - Cooperate with and support the Company's investigation of any suspected violations, and with any necessary corrective measures.

**COMPLIANCE WITH THE LAW**

> Geron and its employees are subject to various Federal and state laws and regulations.
>
> ***
>
> Some of the laws that apply to Geron are described below.

*Insider Trading and Fair Disclosure Policy*

> Employees at Geron are likely to possess information about the Company (or about another company) that is not known to the general public and that is "material:" that is, if it were known to a reasonable investor it could affect the investor's decision to buy, sell or hold the Company's stock. Federal and state laws prohibit trading in Geron stock or other securities while in the possession of material, nonpublic information about the company whose stock is being traded. They also prohibit "tipping" other people about such information so that they can trade, and selective disclosure of such information on behalf of the Company. Geron employees must comply strictly with these prohibitions.

*Accounting and Disclosure Controls*

> Federal law obligates Geron to disclose certain information about its activities in reports filed with the Securities and Exchange Commission (the SEC). Those reports, which may include the Company's financial statements, must be complete and accurate. Under the direction of the Chief Executive Officer (CEO) and Chief Financial Officer (CFO), the Company has designed a set of internal controls and disclosure controls to ensure that all material information about the Company is reported to the appropriate Company officers so that it can be reflected, if appropriate, in the Company's SEC filings, and that all our financial reports are complete, accurate, and reliable. All Geron employees must comply with those internal controls and disclosure controls and with the requirements of

applicable accounting and auditing standards. That includes promptly reporting to his/her supervisor any significant event or occurrence (whether positive or negative) that arises in the course of the employee's work. It also includes reporting immediately to the Controller, the CFO or the CEO any actual or suspected breaches or violations of the Company's internal controls or any actual or suspected fraudulent or questionable transactions or occurrences (e.g., embezzlement, forgery or alteration of checks and other documents, theft, misappropriation or conversion to personal use of Company assets, and falsification of records). Employees are also encouraged to bring to the attention of any Company officer any changes that may improve the Company's system of internal controls or disclosure controls.

\*\*\*

## COMPLIANCE WITH POLICIES ON EMPLOYEE CONDUCT

\*\*\*

### Company Records

Accurate records are crucial to the operations of our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, timesheets, records relating to our product development, clinical development, manufacturing and regulatory submissions and all other records maintained in the general course of business.

All Company records must be complete, accurate and reliable in all material aspects. The Company has a formal document retention policy that each employee and director must follow with respect to Company records within such employee's or director's control. Please contact your supervisor or a Company officer should you have questions concerning this policy.

\*\*\*

## REPORTING VIOLATIONS

**All employees have a responsibility to report violations of this Code of Conduct**, including any violations of the laws, rules, regulations or policies that apply to the Company. An employee should report suspected violations to his/her supervisor. However, if uncomfortable reporting a suspected violation to one's supervisor, an employee may report violations to the Controller, the Human Resources department, the CFO or the CEO. **In addition, any employee may report a violation to the Chair of the Audit Committee of the Board of Directors, whose contact information is attached as Appendix A to this Code of Conduct.** Reports should be in writing whenever practical. All reports of

suspected violations will be handled sensitively and with discretion. The Company and all persons receiving reports will protect an employee's confidentiality to the extent possible consistent with law and the Company's need to investigate the report. Employees may make such reports anonymously, although in some cases it will be difficult to investigate a violation without knowing the identity of the employee who reported it. **No employee will be retaliated against for any good faith report of a suspected violation, even if, after investigation, the Company concludes that no actual violation occurred.**

***

**ETHICS ABOVE ALL**

Ethical conduct in all things is an essential part of Geron's values. In addition to complying strictly with laws, regulations, and policies, all Geron employees are expected to behave ethically at all times. Everyone at Geron should take seriously any question of ethics of Company activities presented in good faith by any employee. No employee will be required to act in a way that he/she, after serious consideration and discussion, finds to be unethical. **Any employee who has any questions about these guidelines may contact his/her supervisor or the Human Resources department.**

123.    In addition to these duties, the Individual Defendants who served on the Audit Committee during the Relevant Period, the Audit Committee Defendants, owed specific duties to Geron under the Audit Committee Charter (the "Audit Charter").[4] The Audit Charter follows certain rules prescribed by the Public Company Accounting Oversight Board ("PCAOB"), a nonprofit corporation created by the Sarbanes–Oxley Act of 2002 to oversee the audits of public companies. Specifically, the Audit Charter provided for the following responsibilities of the Audit Committee Defendants to:

    I.    Purpose

The purpose of the Committee is to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company. The Committee shall assist the Board in fulfilling its oversight responsibilities relating to: the integrity of the

---

[4] See Geron Audit Committee Charter at:
https://s24.q4cdn.com/668523011/files/Gov_Doc/Amended-and-Restated-Audit-Commmittee-Charter-Nov-2017.pdf

financial statements and other information provided by the Company to any governmental body, regulatory agency or the public; the Company's system of internal controls regarding finance, accounting, financial reporting and public disclosures; the Company's compliance with legal and regulatory requirements and with ethics policies that management and the Board have established; the qualifications, independence, and performance of the Company's independent registered public accounting firm ("independent auditors"); and the Company's accounting and financial reporting processes generally. Consistent with this function, the Committee encourages continuous improvement of the Company's policies, procedures and practices at all levels.

\*\*\*

IV.     Responsibilities and Duties

In carrying out its responsibilities, the Committee will endeavor to ensure that the corporate accounting and reporting practices of the Company are in accordance with all regulatory requirements and are of the highest quality. While the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with generally accepted accounting principles. Management is responsible for the preparation, presentation, and integrity of the Company's financial statements and for the appropriateness of the accounting principles and reporting policies that are used by the Company. The independent auditors are responsible for auditing the Company's annual financial statements and for reviewing 3 November 2017 the Company's unaudited interim financial statements. Absent actual knowledge to the contrary, each member of the Committee shall be entitled to rely on the integrity of those persons within the Company and of the professionals and experts (including the Company's independent auditors) from which the Committee receives information and, absent actual knowledge to the contrary, the accuracy of the financial and other information provided to the Committee by such persons, professionals or experts.

\*\*\*

In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention that is within the scope of the powers and responsibilities delegated to the Committee, with full access to all books, records, facilities, and personnel of the Company and the authority to obtain advice from and engage independent counsel, accounting and other advisers, as it determines necessary to carry out its duties. The Committee shall have the appropriate financial resources and authority to retain any

independent counsel, experts or advisors (accounting, financial or otherwise) that the Committee believes to be necessary or appropriate. The Committee may also utilize the services of the Company's in-house legal counsel or other advisors to the Company.

***

1.  <u>Oversight of Independent Auditors.</u>

The Committee shall:

A.  In connection with each annual audit, discuss with the independent auditors and management, the overall scope of the audit, procedures to be followed and staffing of the audit.

B.  Be directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditors (including resolution of any disagreements between management and the independent auditors regarding financial reporting) for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attestation services for the Company, and the independent auditors shall report directly to the Committee.

C.  Approve, in advance, all audit and non-audit services to be performed by the independent auditors. The Company shall not engage the independent auditors to perform the specific non-audit services proscribed by law or regulation. The Committee may delegate preapproval authority to a member of the Committee, provided that any decisions made by the delegate must be presented to the full Committee at its next scheduled meeting. Committee pre-approval of audit and non-audit services will not be required if the engagement for the services is entered into pursuant to pre-approval policies and procedures established by the Committee regarding the Company's engagement of the independent auditors, provided the policies and procedures are detailed as to the particular service, the Committee is informed of each service provided and such policies and procedures do not include delegation of the Committee's responsibilities under the Exchange Act to the Company's management. If the Committee elects to establish pre-approval policies and procedures regarding non-audit services, the Committee must be informed of each non-audit service provided by the independent auditors. Committee pre-approval of non-audit services (other than review and attest services) also will not be required if such services fall within available exceptions established

48

by the SEC.

D.  At least annually, review the independence and quality control
procedures of the independent auditors and the experience and
qualifications of the senior personnel of the independent auditors
that are providing audit services to the Company. In conducting its
review:

    i.  The Committee shall obtain and review a report prepared by the
independent auditors describing (a) the internal quality control
procedures of the independent auditors' firm and (b) any
material issues raised by the most recent internal quality control
review or peer review of the firm, or by any inquiry or
investigation by governmental or professional authorities,
within the preceding five (5) years, respecting one (1) or more
independent audits carried out by the firm, and any steps taken
to deal with any such issues.

    ii.  The Committee shall ensure that the independent auditors
prepare and deliver, at least annually, a written statement
delineating all relationships between the independent auditors
and the Company, consistent with PCAOB Rule 3526,
"Communications with Audit Committees Concerning
Independence." The Committee shall actively engage in a
dialogue with the independent auditors with respect to any
disclosed relationships or services that, in the view of the
Committee, may impact the objectivity and independence of the
independent auditors. If the Committee determines that further
inquiry is advisable, the Committee shall take appropriate action
in response to the independent auditors' report to satisfy itself of
the independent auditors' independence.

    iii.  The Committee shall confirm with the independent auditors that
the independent auditors are in compliance with the partner
rotation requirements established by the SEC.

*** 

E.  At least annually, discuss with the independent auditors the matters
required to be discussed by Auditing Standard No. 16,
Communications with Audit Committees, as adopted by the
PCAOB (including any successor rule adopted by the PCAOB).

***

2.  Review of Financial Statements. The Committee shall:

A. Review and discuss with the Disclosure Committee, prior to dissemination to the public, the Company's Forms 10-K, Forms 10-Q, earnings press releases, any earnings guidance provided to analysts and rating agencies, and other reports or financial information submitted to any governmental body or the public in connection with such financial information, including any certification, report, opinion, or review rendered by the independent auditors.

B. Review with the Disclosure Committee and the independent auditors the financial statements and disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations to be included in the Company's Forms 10-K or Forms 10-Q prior to filing, including their judgment about the quality and acceptability of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures, and the degree of aggressiveness or conservatism of the Company's accounting principles and underlying estimates. The Committee shall discuss the results of the annual audit or quarterly review and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards.

C. Following completion of the annual audit, review separately with management and with the independent auditors any significant difficulties encountered during the audit, including any restrictions experienced by the independent auditors on the scope of their work or access to required information. Among the items that the Committee should consider reviewing with the independent auditors are: (i) any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise); (ii) any communications between the independent auditors' audit team and their national office with respect to auditing or accounting issues encountered during the audit; and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company. The Committee shall obtain assurances from the independent auditors that Section 10A(b) of the Exchange Act has not been implicated.

D. Review any significant disagreement among management, non-management employees and the independent auditors in connection with the preparation of the Company's annual financial statements and any related disclosures.

E. Receive quarterly updates regarding the Company's financial

50

performance as compared to the Company's published financial guidance, if any, including the recommendations, if any, of senior management regarding whether the Company should revise its published guidance or release preliminary financial results.

F.  Based on (i) the review and discussion referred to in paragraph 2(B) above, (ii) the disclosure received from the independent auditors regarding its independence and discussions with the independent auditors regarding such independence pursuant to paragraph 1(D)(ii) above, and (iii) the discussions with the independent auditors pursuant to paragraph 1(E) above, determine whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

G.  Prepare a report to be included in the Company's annual proxy statement, as required by SEC regulations.

H.  Report the results of the annual audit to the Board. If requested by the Board, invite the independent auditors to attend the full Board meeting to assist in reporting the results of the annual audit or to answer other Board members' questions.

3.  <u>Review of Disclosure Matters.</u>

The Committee shall:

A.  Review processes utilized by the Company's management for annually assessing effectiveness of Disclosure Controls and Procedures (as defined in Rule 13a-15(e) of the Exchange Act) and performing quarterly certifications required for the Company's Forms 10-Q and Forms 10-K. Review management's report on its assessment of the effectiveness of internal control over financial reporting as of the end of each fiscal year and the independent auditors' report on the effectiveness of internal control over financial reporting.

B.  Receive and review any disclosures from the Company's Chief Executive Officer and Chief Financial Officer made in connection with the certification of the Company's quarterly and annual reports filed with the SEC regarding: (1) significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial data; and (2) any fraud, whether or not material, that involves management or other employees who have a significant

role in the Company's internal control over financial reporting.

C. Review any significant changes in internal control over financial reporting.

D. Review any material weaknesses or significant deficiencies identified in internal control over financial reporting, as well as any remediation plan to address internal control deficiencies.

E. Receive an annual report from the Company's Chief Executive Officer, Chief Financial Officer and General Counsel (collectively, the "Disclosure Committee") regarding the effectiveness of the Company's internal control over financial reporting and, if appropriate, the Company's disclosure procedures for drug approval, manufacturing and marketing efforts, and material communications between the Company and regulatory agencies.

F. Meet, at least on a quarterly basis, with a member of the Disclosure Committee about concerns, if any, of the Disclosure Committee regarding disclosure issues, including whether there were any post-disclosure corrections to public statements that were recommended by the Disclosure Committee, the action taken in regard to each such recommendation, and for each recommendation not followed, the reason(s) for not following that recommendation.

4. <u>Establishment and Oversight of Policies, Programs and Procedures.</u>

The Committee shall:

A. Review with the Company's management and the independent auditors the results of their periodic analysis of significant financial reporting issues and practices, including changes in accounting principles and disclosure practices.

B. Discuss with the independent auditors the regular reports that such auditors are required to make to the Committee regarding (i) the critical policies and practices of the Company, (ii) the alternative treatments of financial information that are within generally accepted accounting principles and that the independent auditors have discussed with management, and (iii) all other material written communications between the independent auditors and management of the Company, such as any management letter, management representation letter, reports on observations and recommendations on internal controls, independent auditors' engagement letter, independent auditors' independence letter, schedule of unadjusted audit differences and a listing of adjustments and reclassifications

not recorded, if any.

*** 

E. To the extent not already established, establish regular and separate systems of reporting to the Committee by each of management and the independent auditors regarding significant judgments made in the preparation of the Company's financial statements and the view of each as to the appropriateness of such judgments.

F. Review with the independent auditors and management the adequacy and effectiveness of the Company's accounting, financial, disclosure and other controls, both internal and external, of the Company, including the Company's legal and ethical compliance programs, and elicit any recommendations for the improvement of such internal control procedures or particular areas where new or more detailed controls or procedures are desirable. Particular emphasis should be given to the adequacy of such internal controls to expose any payments, transactions, or procedures that might be deemed illegal or otherwise improper.

G. Discuss with management the Company's policies and procedures with respect to risk assessment and risk management. The Committee shall consult with the General Counsel, or other senior-level Company employees, regarding the effectiveness of financial risk management, including significant financial and operation risk exposures and the actions management has taken to limit, monitor or control such exposures.

5. Review of Compliance.

The Committee shall:

A. Establish, review periodically and update as necessary a Code of Conduct (the "Code"), ensure that management has established a system to enforce the Code, and review management's monitoring of the Company's compliance with the Code.

B. Review the adequacy of and management's implementation and monitoring of the Company's internal control over financial reporting to ensure that the Company's financial statements, reports and other financial information disseminated to governmental organizations and the public satisfy legal requirements.

C. Oversee the Company's Insider Trading Compliance Program (the "Program"), including approval of any material updates to the

Program, and receive a report, at least once annually, from the Company's General Counsel as the Company's Insider Trading Compliance Officer (the "Compliance Officer") regarding his or her monitoring of the Program. The Committee shall have regular access to the Compliance Officer, including the opportunity to meet with the Compliance Officer outside of the presence of any other senior executives of the Company.

D. Request assurances from management that the Company's foreign subsidiaries and foreign affiliated entities, if any, are in conformity with applicable legal requirements, including disclosure of related party transactions.

E. Review with the Company's General Counsel any legal matters that could have a significant impact on the Company's financial statements.

F. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

In addition to the foregoing, the Chair of the Audit Committee will receive reports from an independent, third-party supplier engaged by the Company to provide and monitor a whistle-blower hot line for Company employees and consultants, such as the NASDAQ OMX Whistleblower Hotline. The Chair will ensure that all anonymous whistleblower complaints are provided to the Company's General Counsel and that all complaints are completely and fully investigated by the Company's General Counsel, or a designated senior-level employee, in consultation with the Audit Committee. The Company's General Counsel must report to the entire Board at least annually on the status of every whistleblower complaint, if any, received by the Company in the preceding 12-month period.

G. Discuss with management any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process or accounting policies.

124. In violation of the Audit Charter, and their general duties as members, the Audit Committee Defendants failed to properly oversee the Company's compliance with its own policies

54

and regulatory requirements, leading to materially false and misleading statements regarding Geron's operations.

## VI.   BREACHES OF DUTIES

125.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Geron, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

126.   The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the extensive problems the Company was encountering, in connection with its trials of imetelstat, namely that the treatment was ultimately ineffective. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Geron substantial damage.

127.   The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Geron's public statements and internal control function.

128.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of Geron, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities

Class Action, which alleges violations of federal securities laws. As a result, Geron has expended, and will continue to expend, significant sums of money.

## VII.   DAMAGES TO GERON

129.     The improper accounting practices have exposed the Company to myriad reputation and financial damages, including but not limited to:

   (a)     Possible restatements and goodwill impairments;

   (b)     Liability arising from the Securities Class Action;

   (c)     The loss of credibility with customers and suppliers; and

   (d)     Legal and accounting costs associated with litigation, investigations, and restatements.

## VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

130.     Plaintiff brings this action derivatively and for the benefit of Geron to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Geron, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

131.     Geron is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

132.     Plaintiff is, and has been continuously at all relevant times, a stockholder of Geron. Plaintiff will adequately and fairly represent the interests of Geron in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

133.     Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

134.    A pre-suit demand on the Board of Geron is futile and, therefore, excused. At the time of filing of this action, the Board consists of Scarlett, Eastham, Lawlis, Molineaux, and Spiegel, the Director Defendants, along with Bir and O'Farrell who are not defendants in these proceedings. Plaintiff needs only to allege demand futility as a majority of the Directors who are on the Board at the time this action is commenced.

135.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

136.    A majority of the Directors served as Company directors throughout the Relevant Period. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

137.    Demand on Defendant Scarlett is futile because Defendant Scarlett has served as a Company director since 2011. He also serves as the Chair of the Board since December 2018, President since January 2012, and as Chief Executive Officer since 2011. He has received and continues to receive compensation for his role as a director and officer as described herein. Defendant Scarlett signed and thus personally made the false and misleading statements in the

2016 10-K and 2017 10-K. The Company admits in its 2020 Proxy Statement and previous Proxy Statements that Scarlett is not an independent director. Furthermore, Scarlett touted positive information about one of the secondary endpoints in the March 19, 2018 earnings call while omitting the material negative information regarding the primary endpoints. Scarlett is also a defendant in the Securities Class Action. For these reasons Defendant Scarlett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.     Demand on Defendant Scarlett is further futile because Scarlett's principal professional occupation is his employment as President and CEO of the Company, pursuant to which he has earned and stands to earn tens of millions of dollars in annual salary, bonuses and other compensation. In 2017, 2018 and 2019, Defendant Scarlett received $2.7 million, $2.7 million and $1.9 million in compensation, respectively.

139.     Moreover, the Company's Proxy Statements admit that Defendant Scarlett is not independent.

140.     Demand on Defendant Eastham is futile because Defendant Eastham has served as a director since March 2009. Defendant Eastham has received and continues to receive compensation for her role as a director as described herein. Furthermore, Defendant Eastham signed and thus personally made the false and misleading statements in the 2016 10-K and 2017 10-K. As the Chair of the Audit Committee during the Relevant Period and currently, she conducted little, if any, oversight of the Company's material omissions to the public on the actual results of imetelstat. For these reasons, Defendant Eastham has breached her fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon her is futile and, therefore, excused.

141.    Demand on Defendant Spiegel is futile because Defendant Spiegel has served as a Company director since 2010. Defendant Spiegel has received and continues to receive compensation for his role as a director as described herein. Defendant Spiegel signed and thus personally made the false and misleading statements in the 2016 10-K and 2017 10-K. Defendant Spiegel has breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Demand on Defendant Lawlis is futile because Defendant Lawlis has served as a Company director since 2012. He also currently serves on the Company's Audit Committee and served on the Audit Committee during the Relevant Period. He conducted little, if any, oversight of the Company's material omissions to the public on the actual results of imetelstat. Defendant Lawlis has received and continues to receive compensation for his role as a director as described herein. Furthermore, Defendant Lawlis signed and thus personally made the false and misleading statements in the 2016 10-K and 2017 10-K. Defendant Lawlis has breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Demand on Defendant Molineaux is futile because Defendant Molineaux has served as a Company director since 2012. Defendant Molineaux has received and continues to receive compensation for her role as a director as described herein. Furthermore, Defendant Molineaux signed and thus personally made the false and misleading statements in the 2016 10-K and 2017 10-K. Defendant Molineaux has breached her fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon her is futile and, therefore, excused.

144.    As trusted Company directors, the above directors conducted little, if any, oversight

of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Directors breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

145.    The Director Defendants have longstanding business relationships with each other and the Individual Defendants which means they cannot act independently and in the best interests of the Company. Thus, demand upon the Director Defendants would be futile.

146.    Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

147.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to

comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

148.    Geron has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Geron any part of the damages Geron suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

149.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

150.    The acts complained of herein constitute violations of fiduciary duties owed by Geron's officers and directors, and these acts are incapable of ratification.

**Insurance Considerations**

151.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Geron. If there is a directors and officers' liability

insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Geron, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Individual Defendants is futile and, therefore, excused.

152.    If there is no directors' and officers' liability insurance, then the Director Individual Defendants will not cause Geron to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

153.    Thus, for all the reasons set forth above, all of the Director Individual Defendants, and, if not all of them, at least a majority of Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act*

154.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud

claims.

156.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

157.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

158.    The Proxies also stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of Conduct.  The Proxies were also false and misleading because, despite assertions to the contrary, Geron's compliance with its respective codes of conduct were not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

159.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy and 2018 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for

stockholder determination in the Proxies, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

160.    The false and misleading elements of the annual Proxies led to the re-elections of all of the Director Individual Defendants, allowing them to continue breaching their fiduciary duties to Geron.

161.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies

162.    Plaintiff on behalf of Geron has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

163.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

164.    The Individual Defendants, by virtue of their positions with Geron and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Geron and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Geron to engage in the illegal conduct and practices complained of herein.

165.    Plaintiff on behalf of Geron has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants
*for Breach of Fiduciary Duties*

166.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.    Each Individual Defendant owed to the Company the duty to exercise candor, good

64

faith, and loyalty in the management and administration of Geron's business and affairs.

168.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

169.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Geron.

170.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

171.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

172.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements prior to Janssen discontinuing the collaboration, and during the Relevant Period, that assured investors that Geron was on track to show promising results for imetelstat, yet failed to disclose from the time Geron came into existence, major problems which included (1) 90% of patients failed to experience a spleen volume reduction of at least 35%, (2) 68% failed to experience an improvement in debilitating symptoms of at least 50%, and (3) none of the patients experienced a complete remission.

173.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

174.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

175.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

176.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

177.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Geron has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

178.    Plaintiff on behalf of Geron has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants

*for Unjust Enrichment*

179.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.   By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Geron.

181.   The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Geron tied to the performance or artificially inflated valuation of Geron, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

182.   Plaintiff, as a stockholder and a representative of Geron, seeks restitution from the Director Individual Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

183.   Plaintiff on behalf of Geron has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants
*for Waste of Corporate Assets*

184.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

185.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and Geron will lose financing from investors and business from future customers

who no longer trust the Company and its product.

186.     Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

187.     Plaintiff on behalf of Geron has no adequate remedy at law.

## IX.     PRAYER FOR RELIEF

188.     **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Geron, and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Geron;

C.     Determining and awarding to Geron the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.     Directing Geron and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Geron and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1)     A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

2)      A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

3)      Awarding Geron restitution from Individual Defendants;

4)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

5)      Granting such other and further relief as the Court may deem just and proper.

Dated: November 12, 2020

Respectfully Submitted,
**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, Delaware 19801
Telephone: (302) 984-3800
Email: bbennett@coochtaylor.com
*Attorney for Plaintiff*

**OF COUNSEL**
**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com

*Attorneys for Plaintiff Michael Henry Mongiello*